UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MIKE SLICK,                                          No. 07-13727

           Plaintiff,                          District Judge David M. Lawson

v.                                                   Magistrate Judge R. Steven Whalen

ONSTED COMMUNITY SCHOOLS,

           Defendant.

_____/

## REPORT AND RECOMMENDATION

On September 5, 2007, Plaintiff Mike Slick filed a civil complaint under Title I of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Michigan Persons With Disabilities Civil Rights Act ("MPWDCRA"), M.C.L. § 37.1101 *et seq.*  Before the Court is Defendant's Motion for Summary Judgment [Docket #13], which has been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons discussed below, I recommend that Defendant's Motion be GRANTED.

## I.    FACTS

In his Complaint, Plaintiff alleges that he is an individual with a disability, in that he suffers from dyslexia.  *Complaint*, ¶ 9.  He worked for Defendant Onsted Community Schools since 1991 in a number of positions, including groundskeeper and "light maintenance worker." *Id*. ¶ 10. He alleges that the Defendant was aware of his disability, and that he was not hired for the position of Grounds/Repair Person and was ultimately terminated because of his disability, even though he "was informally performing the duties" of the posted position.  *Id*. ¶¶ 11-12, 16.

At his deposition, Plaintiff testified that he is currently employed as a "small engine mechanic," primarily working on lawn mowers, week whackers and chain saws. *Plaintiff's Deposition, Defendant's Exhibit 3*, 6-8.  His former jobs included making gas tanks and brake rotors, working on a production line cutting lumber, and  landscaping (cutting lawns, plowing snow, and installing plants). *Id.* 10-15. He said that he had post-high school vocational classes in horticulture and landscaping.  *Id.* 14.  He described his work for Defendant school district as "grounds, repair and janitorial," cutting grass, planting flowers, sweeping, setting up for events, and maintenance work.  *Id.* 26-27. Plaintiff testified that in 2004, he applied for a position in the copy room, and told supervisors Nancy Sudak and Deb McGee that he had a learning disability and problems reading. He worked in the copy room for six months, when he was told he was no longer needed there. *Id.* 31-34.

After the copy room experience, Plaintiff continued working on the grounds, mowing grass, trimming the hedges and taking care of playground equipment.  He also worked inside with Steve Thompson, the grounds/repair person, checking univents (heating units), replacing electrical plugs and switches, and some furniture repair. *Id.* 36-38.  Plaintiff also claimed to have knowledge of boilers.  *Id.* 58.

Plaintiff testified that in June of 2006, Bob Herrera, then the school superintendent, advised him to apply for an upcoming grounds/repair job.  Herrera told him to take a basic skills test, which he did on June 16, 2006.  *Id.* 48-50. Before taking the test, he told Ms. Sudak that he had dsyslexia; she replied that if there was an "issue" with the test, she would let him know, and he could re-take it. *Id.* 51-53.  Plaintiff thought that he did well on the test, but later, Steve Thompson told him that Herrera said he did badly, that he had a poor reading level, and that the school's attorney said Plaintiff would be a

liability for the new job.  According to Plaintiff, Thompson asked Herrera if someone could read the test for Plaintiff and Herrera said no.  *Id*. 54-57.

The new job was formally posted on October 3, 2006.  At that time, Herrera was no longer the superintendent of schools, and Max Baxter was the interim superintendent. *Id.* 59.  Plaintiff testified that Mike Albright (the supervisor of transportation, buildings and grounds for the district) said "he wanted me outside doing the job because I was qualified to do the job and knew how to do the job."  Plaintiff said that Albright "wanted me doing the grounds work."  *Id*. 77-78.  Nevertheless, in November of 2006, Plaintiff learned that he did not get the job.  *Id*. 79-80.

When asked at his deposition what facts he relied on in making his claim of disability discrimination, Plaintiff referred to Herrera's statement to Thompson that he tested poorly.  However, he conceded that when the hiring decision was made, Herrera was no longer superintendent, was not a member of the school board, and was not present or a member of the panel that interviewed the candidates. *Id*. 82-83. Plaintiff said that as part of the process, he took a "maintenance test," but did not ask for any accommodation in taking the test (eg, a reader) because the job posting did not refer to a test, and Herrera had in the past that he could not get help with the basic skills test.  *Id*. 78, 93-94.

Steve Thompson was the repairman at Onsted Schools.  When he took that position, Plaintiff replaced him as the groundskeeper. *Deposition of Steve Thompson, Defendant's Exhibit 6*, 5-6.  Thompson said that he was also the acting maintenance supervisor, and that the Plaintiff assisted him in minor repairs, such as servicing the mower, changing locks or light bulbs, installing pencil sharpeners, changing motors and cleaning the univents, tasks Thompson described as "basic stuff." *Id.* 7-8.

Max Baxter was the interim superintendent of schools beginning in June of 2006.

-3-

He testified that the district was financially challenged, and they were seeking a repair person who could do more than minor fixes, so that they would not have to outsource repair jobs to expensive contract workers such as electricians and plumbers. *Deposition of Max Baxter, Defendant's Exhibit 4*, 44-45. He said that electrical experience was crucial. *Id.* 52-53.  He said that the repair aspect of the job that was posted was more important than the groundskeeping part, and that it was less expensive to outsource the grounds work.  *Id*. 47-50.  Baxter said that even Thompson did not have the qualifications they were looking for in terms of electrical, construction and carpentry skills.  *Id*. 46. Baxter said that the Plaintiff helped Thompson "if he needed an extra pair of hands," but was limited in repair work.  *Id*. 12.  He testified that although he sat on the interview panel for the job, he had no role in deciding who would be interviewed.  Baxter said that the Plaintiff had a bad interview, and was limited in terms of anything to do with maintenance, other than lawn care.  He said that the district was looking for someone who could do preventive maintenance, plumbing, heating, electrical and building work, and that Plaintiff's responses in those areas were "limited."  *Id*. 13-14.  He acknowledged that the posted job description seemed to emphasize grounds maintenance, but building maintenance was the district's most critical need.  *Id.* 14-15.

Baxter said that of the five people interviewed, the final choice came down between Andy Hosmer and another candidate who had good mechanical skills.  Hosmer got the job, Baxter testified, because of his skills in plumbing, electrical, heating, and building maintenance skills.  *Id.* 20-21.  Hosmer was also a licensed building contractor.  *Id.* 64.  His background in construction was important, Baxter said, because their roofs were a problem.  Hosmer lessened the district's need to hire outside contractors.  *Id.* 65-67.

Baxter also testified that Herrera, the former superintendent, had no input into the hiring process, and that he never discussed the matter with Herrera.  Baxter said that at the time of the interview, he did not know that the Plaintiff had a disability or a reading problem.  *Id.* 55.

Baxter testified that after Hosmer was hired, he proposed a job posting for a groundskeeper that would occasionally be used to assist in maintenance, and that Plaintiff would have been an ideal fit for that job.  Indeed, he created the position with the Plaintiff in mind.  *Id*. 24, 29.[1]  The proposal went through two committees, and the school board ultimately decided not to post the position, for financial reasons.  Mike Albright, who was on the board, said that the money would be better spent on a bus mechanic.  *Id*. 24-26, 29, 35.

Baxter said that after Hosmer was hired, the Plaintiff was involved in incidents where he "unloaded" on (i.e., was verbally abusive to) Mike Albright, Steve Thompson and Mr. Barricklow, another board member. *Id*. 38-39.  He said that he told the supervisors that he thought Plaintiff had become a liability based on his intemperate behavior, and that he was concerned about Plaintiff's potential for a blow up.  *Id*. 39-40, 43.

Michael Albright was the supervisor of transportation, buildings and grounds, and Andy Hosmer, who was hired instead of the Plaintiff, reports to him.  *Deposition of Michael Albright, Defendant's Exhibit 5*, 4-6.  Hosmer's duties include maintaining the athletic fields, doing lighting and electrical work, minor boiler repairs, and general building maintenance.  *Id*.  6-7. He said that Hosmer, who is a licensed builder, built a

---

[1] The job description for the "Grounds/Equipment Maintenance" position, which was never posted, can be found at Plaintiff's Exhibit K and Defendant's Exhibit 16.

press box for the soccer field, put a roof on the press boxes, and built a wheelchair ramp in the football stadium. *Id.* 12-13.

Albright testified that he created the job description, and that he had the final decision on the selection of the candidate.[2] Albright said that the repair aspect of the job was the most important, because those tasks were the most expensive to contract out. *Id.*, 54. Out of 40 applications, six candidates, including Plaintiff, were selected for interviews. He said that the committee that conducted the interviews unanimously decided that Plaintiff was not qualified, and cut the list to 3 remaining candidates. He said that Plaintiff was cut based on his poor interview performance, his qualifications and his resume. *Id.* 15-17, 27. He said that he was familiar with the Plaintiff's work, and that his repair experience was only in the context of helping Steve Thompson. He said that both the Plaintiff and Thompson needed his help with the univents, and described an incident where there was an electrical problem with the univents, and neither Plaintiff nor Thompson knew how to hook up the wires. *Id.* 28-30. He testified that Plaintiff did not have a lot of experience as a maintenance person, and that he essentially helped Thompson by handing him tools and getting him parts. *Id.* 45. He said that Hosmer, on the other hand, was a licensed builder and an experienced contractor, that he answered the interview questions about building maintenance well, and had knowledge "of all the elements that we were looking for in this position." *Id.* 43.[3] Albright stated that Hosmer

---

[2] The job posting can be found at Defendant's Exhibit 10 and Plaintiff's Exhibit G.

[3] Defendant has submitted the affidavit of Andrew Hosmer, as Exhibit 9. Regarding his interview, Hosmer states, at ¶ 13, "For the most part, I was questioned about my knowledge regarding plumbing, electrical, repair, and mechanical systems. We discussed in great length my experiences as an owner and operator of a construction company, which included whole house renovations." Hosmer further states, at 'r 15, "During the interview, I was asked several questions regarding the school budget. Specifically, how my experiences in the construction industry could help save the school

does plumbing and electrical work for the district, and since being hired has accomplished several building projects with a high degree of skill.  He testified, "I'm quite sure that Mike [Plaintiff] was not capable of performing any of these duties whatsoever."  *Id*. 47.

Albright stated that Mr. Herrera, the former superintendent, was not with the district when the hiring decision was made, and that he never spoke to Herrera about the position.  *Id*. 31.

Robert Herrera, the former school superintendent, affirmed that he had no input into the hiring decision, and knew little about the proposed new position.  *Deposition of Robert Herrera, Defendant's Exhibit 8*, 8-9, 25.  He said that he thought the Plaintiff was a good worker, well-liked, and an excellent groundskeeper.  *Id*. 7-8, 23.  He said he thought that at one point, when Plaintiff applied for a job in the copy room, Nancy Sudak talked to Plaintiff about taking a basic skills test.  He later learned that Plaintiff did badly on the test, and affirmed that he made a comment to Steve Thompson regarding the Plaintiff's reading deficiencies. He also talked to the district's attorney about this, but not to anyone else. *Id*. 9, 17-19.  Herrera heard that Plaintiff did not work out in the copy room because he lacked organization, never grasped how to run the machines, and started not showing up for work.  *Id*. 10.

The Defendant has also submitted the job applications/rèsumès of Andy Hosmer and Plaintiff Mike Slick.  Hosmer's application (Defendant's Exhibit 11) notes that he has a Michigan Residential Builders License, that he owns a construction company (Hosmer Construction) and undertakes "projects varied from installing storm doors to whole house renovations," and that he previously worked as a builder.

money when dealing with subcontractors who perform large and complex projects for the school."

Plaintiff's rèsumè (Defendant's Exhibit 12) indicates 13 years experience in landscaping, lawn maintenance and machiner operation, as well as post-high school training in horticulture. In addition to his then current job with the district, his employment history includes operation of machinery such as a backhoe, bulldozers and small weight dump trucks, as well as custodial work. Steve Thompson, who was Plaintiff's supervisor, wrote a letter of recommendation (Defendant's Exhibit 17), stating, "Mike is very knowledgeable about the equipment needed to maintain the grounds at Onsted Community Schools. Mike know how to perform regular maintenance and repairs on the equipment. Mike has experience working as a maintenance sub and is familiar with the systems here at Onsted Community Schools."

Finally, Plaintiff has submitted, as Exhibit H, interview checklists prepared in conjunction with the interviews of Plaintiff and Andy Hosmer. The checklists contain five categories: experience, job knowledge, education, motivation, expression and appearance. Each category has five possible ratings. Mr. Albright rated Hosmer higher than the Plaintiff in the areas of education, expression and appearance, and rated Plaintiff higher in the areas of experience, job knowledge and motivation.

Mr. Baxter rated Hosmer higher than the Plaintiff in the areas of experience, job knowledge, education, expression and appearance, and rated them equally in the area of motivation.

Mr. Gentner, a board member, rated Hosmer higher in the areas of education, expression and appearance, rated the Plaintiff higher in the areas of job knowledge and motivation, and rated them equally in the area of experience.

Tom Salsbury rated Hosmer higher than Plaintiff in the areas of motivation and appearance, and equally in the areas of expression, experience job knowledge and

education.  Salsbury gave Hosmer an overall assessment of "unsatisfactory," and wrote, "Would not consider this candidate, too little experience."  He gave Plaintiff an overall assessment of "marginal," writing, "Has potential if district is willing to invest the time & energy to train & develop."

Tim Volvosek rated Hosmer higher than Plaintiff in the area of appearance, rated the Plaintiff higher in the areas of experience, job knowledge and motivation, and rated them equally in the areas of education and expression.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c).  To prevail on a motion for summary judgment, the non-moving party must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First American Bank*, 916 F.2d 337, 341-42 (6th Cir. 1990). Drawing all reasonable inferences in favor of the non-moving party, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celetox Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact, and summary judgment is appropriate. *Simmons-Harris v.*

*Zelman*, 234 F.3d 945, 951 (6ᵗʰ Cir. 2000).

Once the moving party in a summary judgment motion identifies portions of the record which demonstrate the absence of a genuine dispute over material facts, the opposing party may not then "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact," but must make an affirmative evidentiary showing to defeat the motion.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6ᵗʰ Cir. 1989). The non-moving party must identify specific facts in affidavits, depositions or other factual material showing "evidence on which the jury could *reasonably* find for the plaintiff."  *Anderson*, 477 U.S. at 252 (emphasis added).  If, after sufficient opportunity for discovery, the non-moving party cannot meet that burden, summary judgment is clearly proper.  *Celotex Corp.*, 477 U.S. at 322-23.

## III.   DISCUSSION

### A.   Legal Principles

The Plaintiff's claims under federal law (the ADA) and Michigan law (the PWDCRA) are analyzed under essentially the same standards.  *See Chmielewski v. Xermac*, Inc. 457 Mich. 593, 602, 580 N.W.2d 817, 821 (1998) (citing *Hamlin v. Flint Charter Twp.,* 942 F.Supp. 1129, 1136 (E.D.Mich., 1996)); *Sandison v. Michigan High School Athletic Ass'n, Inc.*, 863 F.Supp. 483, 487, fn.9 (E.D.Mich.,1994), *rev'd on other grounds* 64 F.3d 1206, 1035-37 (6ᵗʰ Cir. 1995).  Therefore, I will discuss this case in the context of the ADA.

The ADA prohibits discrimination by a covered entity "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation job training, and other terms, conditions, and privileges of employment."

-10-

42 U.S.C. § 12112(a).  "To recover on a claim of discrimination under the Act, a plaintiff must show that: 1) he is an individual with a disability;  2) he is 'otherwise qualified' to perform the job requirements, with or without reasonable accommodation; and 3) he was [not hired] solely by reason of his handicap." *Monette v. Electronic Data Sys. Corp.,* 90 F.3d 1173, 1178 (6th Cir.1996).  "The third element requires that the plaintiff suffer an adverse employment action." *Talley v. Family Dollar Stores of Ohio, Inc*., 542 F.3d 1099, 1105 (6th Cir. 2008), quoting *Plautz v. Potter,* 156 Fed.Appx. 812, 817 (6th Cir.2005).

"A plaintiff may prove that he was discriminated against based upon his disability either through direct or indirect evidence." *Monette* at 1178.  Direct evidence of discrimination "is that evidence, which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.,* 176 F.3d 921, 926 (6th Cir.1999).  *See e.g. Smith v. Chrysler Corp.,* 155 F.3d 799, 805 (6th Cir.1998) (noting that direct evidence in an ADA case would be "an employer telling an employee, 'I fired you because you are disabled.'").

Where the Plaintiff seeks to establish discrimination through indirect evidence, the burden-shifting approach, first set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 37 L.Ed.2d 668 (1973), applies.  *Family Dollar Stores, supra* at 1105. Under that framework, the Plaintiff must present a prima facie case of unlawful discrimination.  If he can do so, the burden shifts to the Defendant to "articulate some legitimate, nondiscriminatory reason" for taking the challenged action.  *Johnson v. University of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000).[4]  If the Defendant satisfies

---

[4]This is a burden of production.  *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 868 (6th Cir. 2001).

-11-

that burden, the Plaintiff must then prove, by a preponderance of the evidence, that the proffered reason for the Defendant's actions is not the true reason, but rather a pretext for discrimination.

### B.   Direct Evidence

The Plaintiff has failed to show direct evidence of disability discrimination.  He bases his argument that there is direct evidence on former superintendent Herrera's comment to Steve Thompson that because of Plaintiff's poor reading ability, he would be a liability to the district.  *Plaintiff's Response, Docket #13*, at 26.  However, Herrera was not employed by the district when the job was posted and when the hiring decision was made, and the evidence is unrebutted that he played no role in hiring for the position. Other than expressing his concern to an unnamed attorney (who also had no role in the hiring decision), the only person Herrera made the comment to was Steve Thompson, Plaintiff's co-worker and supervisor.  And apart from the fact that Thompson was not involved in the decision-making process, he in fact wrote a positive letter of recommendation on Plaintiff's behalf.  *Plaintiff's Exhibit L.*

Statements made by persons who have no involvement in the decision-making process may or may not constitute circumstantial evidence of discrimination, but they are not considered direct evidence. *Hopson v. DaimlerChrysler Corp,.* 306 F.3d 427, 433 (6th Cir. 2002); *Birch v. Cuyahoga County Probate Court,* 392 F.3d 151, 165 (6th Cir.2004) ("Evidence either of statements made by non-decision makers or of statements made by decision-makers that are not related to the decisional process itself do not satisfy the plaintiff's burden of demonstrating direct evidence of discriminatory animus"); *Wells v. New Cherokee Corp.,* 58 F.3d 233, 238 (6th Cir.1995) (intermediate level supervisor must have been "meaningfully involved" in the decisional process for his remarks to constitute

-12-

direct evidence of discrimination); *Carter v. University of Toledo,* 349 F.3d 269, 273 (6th Cir.2003)("comments made by individuals who are not involved in the decision-making process regarding the plaintiff's employment do not constitute direct evidence of discrimination").

Therefore, the Plaintiff is obliged to establish his case through indirect evidence, under the *McDonnell Douglas* formulation.

### C.   Indirect Evidence

### 1.   Prima Facie Case

The initial question in an indirect evidence analysis is whether the Plaintiff has made out a *prima facie* case of disability discrimination. Under the *McDonnell Douglas* formulation as applied to ADA claims, "the plaintiff may establish a *prima facie* case of discrimination by showing that: (1) he or she is disabled; (2) otherwise qualified for the position, with or without reasonable accommodation; (3) suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Hedrick v. Western Reserve Care System*, 355 F.3d 444, 453 (6th Cir. 2004) (citing *Monette* at 1186-87).[5]  To survive summary judgment, the Plaintiff must show that there are genuine questions of material fact as to these elements.

Defendant claims that dyslexia does not qualify as a disability under the ADA. I disagree. To show a disability, a plaintiff must have a physical or mental impairment that substantially limits one or more major life activities. 42 U.S.C. § 12102; *Bragdon v.*

---

[5] In arguing that Plaintiff has not made out a *prima facie* case, the Defendant applies the four-part test set forth in *Sutherland v. Michigan Dept. of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003). *See Defendant's Motion, Docket #13*, at 19.  *Sutherland* was a Title VII case, and while the test is similar to the ADA analysis set forth in *Hedrick*, it is not identical.

-13-

*Abbot*, 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998).  Major life activities are defined in the applicable regulations as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, *learning*, and working ." 29 C.F.R. § 1630.2(i). (Emphasis added). An individual is considered to be substantially limited if he or she is (i) unable to perform a major life activity that the average person in the general population can perform; or (ii) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity. *Id.* § 1630.2(j).

Plaintiff has presented evidence to show that he indeed suffers from dyslexia, *see Plaintiff's Exhibits A and B*, that he was tested for and determined to have a learning disability in the Onsted School District as far back as first grade, and that in his senior year in the Onsted Schools, he was given special job training based on his learning disability. *Deposition of Mike Slick,* 17-20.  Thus, as the court found in *Stubbs v. Regents of University of California*,  2007 WL 1532148, *8 (E.D.Cal. 2007), "[t]here is no dispute that dyslexia is a 'physical or mental impairment,' *see* EEOC Compliance Manual § 902.3(b), or that plaintiff suffers from dyslexia."  The critical question is whether Plaintiff's condition limits learning or reading, both "major life activities." *Stubbs* at *8. Given the evidence, including his Basic Skills Test, that Plaintiff reads at a very low grade level, there is at least an issue of fact as to whether he has a disability within the meaning of the ADA.

Defendant also disputes whether Plaintiff was "otherwise qualified" to perform the duties of the job.  However, there is sufficient evidence that, for purposes of establishing a *prima facie* case, Plaintiff was qualified.  The interview sheets, *Plaintiff's Exhibit H*,

-14-

give the Plaintiff ratings that are in some of the categories superior to Andy Hosmer's and in some of the categories equal to Hosmer.  Plaintiff and Hosmer were both among six candidates that were selected for interviews out of approximately 40 applications.  While, as discussed below, Hosmer was clearly more qualified than Plaintiff in areas that were the most critical to the Defendant, it cannot be said as a matter of law that the Plaintiff was unqualified.

The Defendant does not dispute that there was an "adverse employment decision" in that Plaintiff was not hired for the job.

Although Mr. Albright, who was the principal decision-maker with regard to the position, indicated that he had never spoken with Mr. Herrera, the former superintendent, and was not otherwise aware of the Plaintiff's reading disability, there is sufficient evidence in the record from which the trier of fact could reasonably infer that the Defendant was knew or had reason to know of it.  School personnel had previously discussed Plaintiff's reading and performance problems in the context of the copy room job, and Plaintiff had been a specially accommodated student in the Onsted schools since first grade, even getting special vocational training during his senior year of high school.

The fifth factor is whether the position remained open.  It obviously did not, since Mr. Hosmer was hired.  The ultimate question, of course, is whether the employer took an adverse employment action solely because of an applicant's disability, and "the precise characterization of the fifth prong of the test will sometimes vary depending upon the factual scenario confronting the court." *Monette, supra*, 90 F.3d at 1186, fn.11. Here, the Plaintiff's claim is that he was denied the job because of his disability or the perception of his disability, and the job went to a non-disabled individual that was equally or lesser qualified. While this fifth prong presents a close question, I find that under the totality of

-15-

the circumstances, and with due regard to the underlying purposes of the ADA, Plaintiff

has adequately shown questions of material fact as to the *prima facie* case.

## 2.    Non-Discriminatory Reason / Pretext

Defendant has more than met its burden or producing evidence that its reasons for

hiring Andy Hosmer rather than the Plaintiff was legitimate and non-discriminatory.  The

evidence is unrebutted that the Defendant School District, like most school districts in this

State, was suffering from budgetary problems.  State law requires districts to balance their

budgets.  *Defendant's Exhibit 22* is the affidavit of Debara McGee, the District's business

manager, who is responsible for developing the annual general budget.  In ¶ 9, she states

that in the 2004-2005 and 2005-2006 school years, expenditures exceeded revenues,

resulting in loss of fund equity of, respectively, $120,944 and $176,571. The testimony of

Baxter and Albright shows that the District created the new position in order to save

money that was being spent on expensive outside contractors, particularly for electrical,

plumbing and maintenance work, as well as construction and building work.

The evidence also shows that while the Plaintiff had considerable experience in

groundskeeping and landscaping, he was deficient in repair and construction skills as

compared to Andy Hosmer, who was a licensed builder and owner of a construction

company. Indeed, Plaintiff's rèsumè, *Defendant's Exhibit 12*, stresses landscaping work

and landscape equipment operation over repair or physical maintenance. The maintenance

work he references pertains to mowing equipment.  Mr. Albright testified that he had

observed both Plaintiff's work and Steve Thompson's work, and both left much to be

desired, particularly with regard to electrical work.  He said that the Plaintiff's

involvement with building maintenance was primarily as an assistant to Thompson,

handing him tools, etc.  Thompson also testified that Plaintiff helped him with "minor

repairs," and in his letter of recommendation (*Defendant's Exhibit 17*), he described Plaintiff as "very knowledegable *about the equipment needed to maintain the grounds*" and the maintenance of this type of equipment.

According to Albright, Mr. Hosmer showed at his interview that he had a much more impressive knowledge of areas that were deemed more critical to the District, such as electrical and construction. Indeed, both Albright and Steve Thompson testified that since being hired, Hosmer has undertaken building projects that Plaintiff would not have been able to do. *See Thompson Deposition, Defendant's Exhibit 6*, 9-10; *Albright Deposition, Defendant's Exhibit 5, 12-13, 47.* Mr. Baxter testified that Hosmer's presence at the school reduced the need to hire third-party contractors. *Baxter Deposition, Defendant's Exhibit 4*, 67. In his affidavit, *Defendant's Exhibit 9*, Mr. Hosmer lists numerous projects that he has completed for the Defendant, saving them money, including building a two-story press box that, based on his experience as a building contractor, would have cost over $20,000 if the job had been outsourced. *Id.* ¶ 24. Hosmer also remodeled the football stadium's press box, including installing new electrical and lighting systems, installing a new roof and finishing the interior walls, saving the District several thousand dollars in labor costs alone. Significantly, Hosmer undertook a number of lighting and electrical installation and re-wiring projects, including re-wiring the univents, a task that, according to Mr. Albright's testimony, both the Plaintiff and Steve Thompson were incapable of handling. *Id*.

In attempting to show that the Defendant's proffered reasons for hiring Mr. Hosmer were pretextual, the Plaintiff argues that the written job description that was posted seems to emphasize grounds work, and does not include the electrical, plumbing and building skills that were ultimately used to justify the hiring of Mr. Hosmer. The job

-17-

description, *Defendant's Exhibit10*, does list the following qualifications : (4) Must have
working knowledge of Onsted Schools' boilers and controls; (5) Must understand the
repair of equipment;[6] (6) Must have basic electricity knowledge; (7) Must know how to
make roof repairs.[7]  The Performance Responsibilities listed in the posting include: (6)
Responsible to keep the school equipment and buildings repaired; (7) Responsible to
assist in the repair and cleaning of boilers; (8) Responsible to make minor electrical
repairs; (10) Responsible to keep the lighting in proper working order; and (as a catch-all
responsibility), (12) Responsible for other duties assigned by the supervisor or
superintendent.

　　　　Therefore, the requirements deemed important by the Defendant in order to reduce
costs, and considered when selecting Hosmer over the Plaintiff, are at least in general
terms included in the written posting.

　　　　Moreover, even if the Defendant did ultimately shift the emphasis from grounds
work to more specific construction and electrical that Hosmer possessed, that does not
establish pretext.  In *Browning v. Department of Army*,  436 F.3d 692, 695 -696 (6th Cir.
2006), an age discrimination case, the court noted that a plaintiff may demonstrate that
the proffered reasons for the employment decision is pretextual by showing that those
reasons "(1) had no basis in fact, (2) did not actually motivate its conduct, or (3) were
insufficient to warrant the challenged conduct." (*citing Manzer v. Diamond Shamrock
Chems., Co.,* 29 F.3d 1078, 1084 (6th Cir.1994)).  The *Browning* court rejected the
plaintiff's argument that the Army's reliance on criteria that deviated from a written

─────────────────────

　　　　[6] This would presumably include repair of the univents, including wiring and
installation.

　　　　[7] Plaintiff has not shown that he knew how to repair a roof.  Hosmer, on the other
hand, is a licensed contractor with extensive experience in that area.

-18-

"matrix" (analogous to the job posting in this case) could be evidence of pretext:

> "[T]his court has held that employers are *not* rigidly bound by the language in a job description. *Wrenn v. Gould,* 808 F.2d 493 (6th Cir.1987). As explained in *Wrenn,* employment-discrimination laws do "not diminish lawful traditional management prerogatives in choosing among qualified candidates," and an employer has "great [ ] flexibility in choosing a management-level employee." *Id.* at 502 (holding that an employer can consider factors external to a job description when selecting among qualified candidates) (citation and quotation marks omitted)." *Id*. at 696.

*Browning* quoted with approval the following language from the D.C. Circuit's

decision in *Aka v. Washington Hospital Center,* 156 F.3d 1284, 1297 n. 15

(D.C.Cir.1998):

> "[R]easonable employers do not ordinarily limit their evaluation of applicants to a mechanistic checkoff of qualifications required by the written job descriptions. Obviously, they will take additional credentials into account, if those credentials would prove useful in performing the job."

The *Browning* court concluded that "[q]uestioning the Army's hiring criteria is not

within the province of this court, even if the Army's hiring process was entirely

subjective."  *Id*. at 698. In this case, even if the criteria used to select the candidate

exceeded the literal job and responsibility description, those criteria were not entirely

subjective, and included the candidates' relative skills and experience in areas that were

deemed critical to the District's goal of saving money by keeping repair, maintenance and

construction work in-house. *See Bender v. Hecht's Dept. Stores*, 455 F.3d 612, 628 (6th

Cir. 2006)(*citing Verniero v. Air Force Academy School Dist. No. 20*, 705 F.2d 388, 390

(10th Cir. 1983)(advising courts to avoid "the illegitimate role of acting as a 'super

personnel department,' overseeing and second guessing employers' business decisions.").

There is little doubt that the Plaintiff was a skilled and well-respected

groundskeeper and landscaping man.  However, by any objective criteria, his skill,

experience and qualifications pale in comparison to Mr. Hosmer in relation to the areas

that were deemed most critical to the Defendant. Indeed, Plaintiff does not claim, nor has he presented any evidence, that he is capable of performing the more sophisticated tasks undertaken by Hosmer.  And while the Plaintiff contends that he was unfairly required to take Mr. Albright's maintenance test without a suitable accommodation, it is clear from this record that given the breadth of Hosmer's experience and skill, as well as his interview performance[8], he would have gotten the job anyway.

In *Braithwaite v. Timken Co.,* 258 F.3d 488, 494 (6th Cir.2001), the Sixth Circuit affirmed a grant of summary judgment because "no reasonable juror could find that the employer's adverse employment action was pretextual."  Mr. Hosmer got the job because overall, he was the more qualified candidate, and the candidate with the skills that would more effectively save the Defendant money that would otherwise be spent on expensive contract labor.  Plaintiff has not met his burden of showing a genuine issue of material fact that the Defendant's reasons were pretextual. In other words, this "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," *Simmons-Harris v. Zelman*, *supra*, 234 F.3d at 951.  Therefore, as to Defendant's decision to not hire the Plaintiff, Defendant is entitled to summary judgment.

Plaintiff claims two other adverse employment decisions.  The first involves the school board's decision to not post the groundskeeper oriented job proposed by Mr. Baxter.  The Defendant has presented evidence that Baxter's proposal went to two committees, and was rejected for budgetary reasons.  It should be noted that Mr. Baxter, the acting superintendent, testified that he proposed and drafted a posting for this second position with the Plaintiff in mind, believing the job was a perfect fit for the Plaintiff.  In

---

[8] Both Albright's deposition testimony and Hosmer's affidavit show that Hosmer was questioned specifically about the repair and maintenance aspects of the job, including plumbing, electrical, repair and mechanical systems.

-20-

other words, the entire issue of the second job arose out of an attempt to help the Plaintiff,
giving force to the adage that "no good deed shall go unpunished."  In any event, Plaintiff
can hardly claim that he was wrongfully denied a position that was never posted by the
school board, and has certainly presented no evidence to rebut the Defendant's showing
that the job was not posted for budgetary reasons.

Plaintiff also claims disability discrimination as a result of not being called in as a
"sub" for grounds work after November of 2006.  However, Mr. Albright testified that he
did not use subs after October or November of 2006.  *Albright Deposition*, 41.  Although
Plaintiff makes a conclusory statement that subs have been used, he has not identified
anyone who was called by Albright or anyone else as a sub.  In addition, the evidence is
unrebutted that after Hosmer was hired, the Plaintiff engaged in abusive conduct toward
Mr. Albright and Mr. Baxter, the acting superintendent.  Baxter testified that the Plaintiff
"unloaded" on Thompson, Baxter and Barricklow, and had become a liability based on
his intemperate behavior. He said that he was concerned about Plaintiff's potential for a
blow up.  *Albright Deposition*, 39-40, 43.  Plaintiff does not deny these allegations.  Even
assuming that other substitute workers were called, Plaintiff's use of profanity and hot-
headed behavior constitutes a legitimate, non-discriminatory reason for not calling him,
especially given that his work might bring him into contact with students.  *See Matima v.
Celli,* 228 F.3d 68, 79 (2nd Cir. 2000) ("We have held generally that insubordination and
conduct that disrupts the workplace are 'legitimate reasons for firing an employee.' *Holt
v. KMI-Continental, Inc.,* 95 F.3d 123, 130 (2d Cir.1996) (citing *Graham v. Texasgulf,
Inc.,* 662 F.Supp. 1451, 1462 (D.Conn.1987), *aff'd,* 842 F.2d 1287 (2d Cir.1988))."  In
*Graham,* 662 F.Supp. at 1462, the court found that a "*prima facie* case for retaliatory
dismissal was sufficiently rebutted without any evidence of pretext" where the employee's

-21-

"overall conduct detracted from the cooperative spirit and the exchange of ideas characteristic of, and necessary to the continued productivity of the [workplace]."

As was the case with the Defendant's decision not to hire him for the maintenance position, the Plaintiff has not presented evidence sufficient to rebut Defendant's legitimate and non-discriminatory reasons for not calling him as a sub, or to show that those reasons are pretextual.

## IV.   CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment [Docket #13] be GRANTED, and the Complaint DISMISSED WITH PREJUDICE.

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v Walters,* 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained

-22-

within the objections.


                                             S/R. Steven Whalen
                                             R. STEVEN WHALEN
                                             UNITED STATES MAGISTRATE JUDGE

Dated:  September 4, 2009

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on September 4, 2009.


                                             S/Gina Wilson
                                             Judicial Assistant